**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**MARÍA CARMEN COLÓN**

**Plaintiff,**

**v.**                                                    **CIVIL NO. 13-1569 (GAG)**

**MEDTRONIC, INC. et al.,**

**Defendants.**

## OPINION AND ORDER

On July 22, 2013, María Carmen Colón (hereinafter "Plaintiff") brought this action against Medtronic, Inc. (hereinafter "Medtronic") and Omar Alvarado Albino (hereinafter "Alvarado") (collectively referred to as "Defendants") alleging age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and age discrimination, retaliation and willful violation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*  Plaintiff also invokes the court's supplemental jurisdiction to bring claims under Puerto Rico Law 100 of June 30, 1959 ("Law 100"), P.R. Laws Ann. tit. 29, §§ 146 *et seq.*, and Law 115 of December 20, 1991 ("Law 115"), P.R. Laws Ann. tit. 31, § 194a.  Essentially, Plaintiff claims that she suffered an adverse employment action as a result of Defendants' discrimination on the basis of age and retaliation.  (Docket No. 1.)

Presently before the court is Defendants' motion for summary judgment at Docket No. 36. Defendants move for summary judgment arguing that Plaintiff fails to establish a *prima facie* case of age discrimination and related claims under the ADEA because: (1) she cannot show she was meeting Medtronic's legitimate performance expectations; and (2) because the record is wanting of

**Civil No. 13-1569 (GAG)**

any evidence of pretext.  (Docket No. 36.)  Further, Defendants argue that Medtronic acted in a lawful and reasonable manner towards Plaintiff at all times, as per company policy.  Id.  Plaintiff opposed Defendants' motion, arguing that a genuine issues of fact exists as to: (1) whether Plaintiff met Medtronic's expectations; and (2) whether Alvarado's evaluation of Plaintiff was intended to mask his discriminatory and disparate treatment vis-à-vis her substantially younger and similarly situated peers.  (Docket No. 42 at 1.)  Defendants thereafter filed a reply.[1]  (Docket No. 53 at 1-2.)  After careful review of the parties' submissions and pertinent law, the court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment at Docket No. 36.

## I.    Relevant Factual and Procedural Background

Plaintiff was born on February 9, 1957, obtained a bachelor's degree in sciences in industrial engineering from the University of Puerto Rico in 1981, and began working at Medtronic's Juncos site on November 27, 2006 as a Manufacturing Supervisor.  (Docket Nos. 39 ¶¶ 1-3; 41 ¶¶ 1-3.)  Therefore, Plaintiff was forty-nine (49) years old when she began working at Medtronic.  See id.  Plaintiff was assigned to the second shift of the Cardiac Rhythm Disease Management manufacturing operation.[2]  (Docket Nos. 39 ¶ 3; 41 ¶ 3.)  Alvarado began working at Medtronic on September 12, 2011.  (Docket Nos. 41 ¶ 17; 39-10.)  He became Plaintiff's supervisor on October 10, 2011.  (Docket Nos. 41 ¶ 17; 39-10.)  Medtronic management employees began to receive quarterly evaluations in July, 2011.  (Docket Nos. 39 ¶ 59; 41 ¶ 59.)

---

[1] The court notes that on July 13, 2015, seven months after filing their reply, Defendants informed the court, via informative motion about the "misidentification" of an exhibit in their reply.  See Docket No. 81.  It is evident that Defendants became aware of the missing document upon the court's request for courtesy copies.  Defendants then proceeded to "re-submit" the exhibits but this time with the corresponding document.  Id.  However, the court notes that one of the documents submitted by Defendants, Docket No. 81-2, was not originally part of the instant record.  As such, said document is disregarded by the court, and hereby stricken from the record because, as Plaintiff points out, the court's order at Docket No. 79 requesting courtesy copies of the parties' submissions was aimed at facilitating the court's handling of the lengthy summary judgment filings, and not as an opportunity for any of the parties to amend their filings in any way.

[2]  Plaintiff continues to work at Medtronic as a Manufacturing Supervisor.  (Docket No. 36 at 1.)

Civil No. 13-1569 (GAG)

A.  Plaintiff's Performance Evaluations

Prior to Alvarado's arrival at Medtronic, Plaintiff had received evaluations which reflected that she met −but did not exceed− expectations at Medtronic.  (Docket Nos. 39 ¶ 58; 41 ¶ 58.)  During the time Alvarado was manufacturing manager at Medtronic; Sandra Rodríguez ("Rodríguez") supervised the first shift of the Lean Lines segment, while Plaintiff supervised the second shift of the Lean Lines segment, Carmen Viviana Rivera ("Rivera") supervised the first shift of the Network segment, and Lisandra Rosario ("Rosario") supervised the second shift of the Networks segment.  (Docket Nos. 39 ¶ 19; 41 ¶ 19.)   The parties disagree as to whether the division of labor between the first and second shifts was equivalent.  (Docket Nos. 39 ¶ 21; 41 ¶ 21.)  However, Plaintiff admits that the division of work is currently equivalent.  (Docket No. 41 ¶ 22.)  Plaintiff alleges that there were occasions where the second shift handled the "IS IV Line," whereas the first shift did not have to work with said line.  (Docket No. 41 ¶ 22.)

During the three-month period immediately before Alvarado became Plaintiff's supervisor, Plaintiff did not receive a work performance evaluation from Medtronic.  (Docket Nos. 39 ¶ 60; 41 ¶ 60.)  Alvarado gave Plaintiff the first evaluation of her performance for the period of August, 2011 to October, 2011.  (Docket Nos. 29 ¶ 59; 41 ¶ 59.)  The evaluation for said period reflects that Plaintiff met, and sometimes exceeded, the objective expectations and goals regarding productivity in her assignments.  (Docket No. 41 ¶ 62.)  For said quarter's first goal, Plaintiff had to; (1) achieve 99 percent volume: and, (2) achieve 93 percent mix for all business units.  Plaintiff's results were 101 percent and 95 percent respectively.  Id.  Accordingly, as noted by Alvarado in the evaluation, Plaintiff exceeded with regard to the production goals.  Id.  According to company policy, the first goal (volume and mix) is an important Key Performance Indicator, and Key Performance Indicators are important for a Manufacturing Supervisor at Medtronic to meet

Civil No. 13-1569 (GAG)

1    the supply of quality product daily goals.  (Docket Nos. 41 ¶ 62; 41 at 28 ¶ 21; 41-19 at 80.)  For

2    said quarter's second goal, Plaintiff had to reduce drop units from $200,000 to $160,000.  (Docket

3    Nos. 41 ¶ 62; 39-20 at 1.)  Alvarado noted that this was a year-long goal and as such, for that

4    quarter, Plaintiff was on target.  Id.  Plaintiff also completed said quarter's third goal.  Id.

5         In Alvarado's first quarterly evaluation of Plaintiff's performance, he did not give Plaintiff

6    a specific scaled rating but noted that she was not very knowledgeable regarding the operations of

7    her line and that it was her coordinator, and subordinate, and not Plaintiff who was seen by her

8    team of employees as the go-to leader of her line in the second shift.  (Docket Nos. 39 ¶ 62; 41 ¶

9    62.)  Alvarado also noted that: (1) Plaintiff should become more proactive and engage in

10   leadership over her shift; (2) she should begin showing more accountability for the situations in her

11   line and the CAPA 116464 which she still owned at the time −but upon her request would later be

12   reassigned; and (3) she needed to stop making comparisons between shifts and start working on

13   developing closer relationships with her peers.  (Docket Nos. 39 ¶ 62; 41 ¶ 62.)  He recommended

14   that she conduct a 360 Feedback Evaluation in order to understand how others saw her

15   performance and then draft a plan on how to use that information towards her improvement. [3]

16   (Docket Nos. 39 ¶ 62; 41 ¶ 62.)

17        Plaintiff responded to Alvarado's assessment in the first evaluation.  (Docket No. 41 ¶

18   29.)  In her response, Plaintiff stated, among other things, that she does have communication with

19   her fellow employees; that she is involved in the situations that happen in her lines and her work

20   area; and that it has never been her intention to make comparisons between shifts.  Id.  At the end

21   of her comments, Plaintiff requested the following from Alvarado: "It is important that in the

22

23        [3] A 360 Feedback Evaluation is a performance improvement tool through which an employee requests
     feedback from his or her peers and superiors and other employees regarding his or her performance, and obtains

24   suggestions on how to improve overall performance.  (Docket No. 39-11 ¶ 15.)

Civil No. 13-1569 (GAG)

future I be oriented regarding the dynamic expected from you so that we may avoid misunderstandings." (Docket No. 41 ¶ 29.)

In regards to Plaintiff's second quarterly evaluation, Defendants allege that although no specific scaled rating was provided, reviews for Plaintiff's performance during that evaluation period were mixed.  (Docket No. 39 ¶ 64.)  Defendants allege that Alvarado highlighted that Plaintiff had been able to meet some of the goals for the quarter.  Id.  However, Alvarado reiterated his prior assessment of Plaintiff and noted that: (1) she continued to not be very knowledgeable regarding operations of her line; (2) she continued to show lack of accountability for her shift; (3) she depended on her Coordinator and subordinate for decision making on the floor, a core duty of her position as Supervisor; (4) she had not completed the 360 Feedback Evaluation that he requested the preceding quarter; (5) she failed to coordinate and establish a workshop cleanup procedure even though she was specifically instructed to do so; and (6) she failed to carry out her role as owner of CAPA 116464.  Id.  As part of the comments submitted by Plaintiff regarding Alvarado's second evaluation of her work performance, for the period of October 29, 2011 to January 27, 2012, Plaintiff stated: "I would like to know the guidelines for which I will be evaluated." (Docket Nos. 41 ¶ 38; 41-1 at 8-9 ¶ 22.)

Alvarado's third quarterly evaluation of Plaintiff, given at the end of Fiscal Year 2012, reflected that Plaintiff did not meet the expectations of her Manufacturing Supervisor position for fiscal year 2011-2012.  (Docket Nos. 39 ¶ 65; 41 ¶ 65.)  Alvarado again noted his concerns that Plaintiff continued to be not very knowledgeable regarding the operations of her line, and again noted her lack of accountability.  (Docket Nos. 39 ¶ 65; 41 ¶ 65.)  He again reiterated that Plaintiff should assume more leadership and engage in her decision-making role and to cease depending on her coordinator for functions that were part of her core duties as supervisor.  Id.  Alvarado also

Civil No. 13-1569 (GAG)

noted that Plaintiff had yet to produce the results of the 360 Feedback Evaluations he had asked her to conduct two quarters earlier.  (Docket Nos. 39 ¶ 65; 41 ¶ 65.)  Plaintiff, again, alleges that these assertions were regarding subjective matters and that the evaluation clearly reflects that Plaintiff met and/or exceeded the objective expectations and met Medtronic's productivity goals.  (Docket No. 41 ¶ 65.)  One of the goals that Plaintiff had to meet was "Complete action on-time and effectively as required by April-2012" and Alvarado states in the "Results" section that the task was completed and approved by the CAPA board.  (Docket Nos. 41; 39-21.)  Plaintiff also had to meet goals and results as follows: (1) she had to meet 99 percent volume and achieved 100 percent; (2) she had to meet 93 percent mix and achieved 95 percent; (3) she had to meet 99 percent IPG and achieved 99.7 percent; and (4) she had to meet 99 percent ICD and achieved 101 percent.  Id.  Plaintiff exceeded all four goals.  Id.  Alvarado's evaluation states that the goals were completed.  Id.  Plaintiff also had to "Complete milestones for implementation of productivity improvements for Lean Line as planned for April-2012", which she did, and Alvarado stated as much in the evaluation where he states "currently line #1 is performing as expected."  (Docket Nos. 41 ¶ 65; 39-21.)

In regards to Plaintiff's "General Performance" for the quarterly evaluation corresponding to January 28, 2012 through April 27, 2012, Alvarado stated that he received eight to nine "feedbacks" from various areas of Medtronic, and that most of the feedbacks were very good.  Id.  In that same quarterly evaluation, Alvarado stated that Plaintiff's performance did not meet the expectations of a Manufacturing Supervisor.  (Docket Nos. 41 at 33 ¶ 48; 39-21.)  Defendants allege that this evaluation reflected that Plaintiff did not meet the expectations of her Manufacturing Supervisor position.  (Docket No. 39 ¶ 65.)  Plaintiff, on the other hand, alleges

Civil No. 13-1569 (GAG)

that Defendants were unlawfully discriminating against her when they gave her the negative evaluation.  (Docket No. 42 at 22-23.)

      B.  <u>Performance Evaluations of the Other Manufacturing Supervisors</u>

      Plaintiff argues that when one compares Alvarado's evaluations of Plaintiff's performance, to his evaluations of the other Manufacturing Supervisors it is clear that discrimination is amiss.  <u>Id.</u> at 23.  For example, pursuant to the goals which Rivera had to meet for the quarterly evaluation corresponding to the period of April 28, 2012 to July 27, 2012, Rivera had to achieve on-time delivery that exceeded 90 percent and product availability had to exceed 98 percent.  (Docket Nos. 41 at 34 ¶ 51; 41-10 at 1.)  However, Rivera's result was 87.6 percent.  (Docket No. 41 at 34 ¶ 51.)  Accordingly, Alvarado states the following in Rivera's evaluation: "Network line is not consistently achieving output and on-time delivery thus impacting customer satisfaction, creating backlogs and increasing lead time.  <u>Id.</u>  Nevertheless, Alvarado did not state in Rivera's evaluation for April 28, 2012 to July 27, 2012 that Rivera had not met his expectations.  (Docket Nos. 41 at 34 ¶ 52; 41-10.)  Similarly, for Alvarado's evaluation of Rivera's work performance for the period of July 28, 2012 to October 26, 2012 he identified that her lowlights included: (1) the Neuro FRY Yield results were under the goal for the entire quarter; (2) Rivera missed the WIP inventory AOP in August; (3) $21,000 over-budget Manufacturing Cost Centers; (4) Rivera missed her productivity goal throughout the quarter; (5) Rivera missed the Conversion Loss for August; and (6) Rivera missed the goal for Kaizen Ideas implemented.  (Docket Nos. 35 ¶ 54; 41-11.)  Nevertheless, Alvarado did not state in Rivera's evaluation for the period of July 28, 2012 to October 6, 2012 that Rivera had not met his expectations.  (Docket Nos. 35 ¶ 54; 41-11.)

      Alvarado also evaluated Rodríguez's work performance for the period of January 28, 2012 until April 27, 2012.  (Docket No. 41 at 35 ¶ 56.)  Pursuant to the goals, which Rodríguez had to

**Civil No. 13-1569 (GAG)**

meet for the quarterly evaluation corresponding to January 28, 2012 to April 27, 2012, Alvarado listed two goals in the "Service" area. (Docket Nos. 41 at 35 ¶ 57; 41-12.)  The second goal was to "Deliver IS-4 Devices Launch quantities for January 2012.  (Docket Nos. 41 at 35 ¶ 57; 41-12.) However, in the "Results" section, Alvarado only makes reference to the first goal, and does not state whether or not Rodríguez met the goal of delivering IS-4 devices launch quantities for January 2012.  (Docket Nos. 41 at 35 ¶ 57; 41-12.)  Alvarado did not state in Rodríguez's evaluation for January 28, 2012 to April 27, 2012 that Rodríguez had not met his expectations. (Docket 41 Nos. at 36 ¶ 58; 41-12.)  For the period of April 28, 2012, to July 27, 2012, Rodríguez was to exceed 90 percent on-time delivery.  (Docket 41 Nos. at 36 ¶ 60; 41-13.)   In Rodríguez's evaluation for said period, Alvarado noted that in the month of June, the on-time delivery results were only 84.4 percent, and noted that it was affected in part by issues of absenteeism. (Docket Nos. 41 at 36-37 ¶¶ 61, 67; 41-13; 41-14.)  Alvarado did not state that in Rodríguez's evaluation for April 28, 2012 to July 27, 2012 that Rodríguez had not met his expectations.  (Docket Nos. 41 at 36 ¶ 62; 41-13.)  Alvarado also evaluated Rodríguez's work performance for the period of January 26, 2013 to April 26, 2013 and noted that: (1) Rodríguez displayed a negative response to the challenges she was facing; (2) she displayed a negative behavior towards accepting change and working on new ideas or new ways of doing things; and (3) she constantly reverted to saying that she has too much work; that she showed multiple concerns regarding the work done by co-workers Yayra and Idalis but was not being part of the solution; and (4) that it looked like she could not be part of a team.  (Docket Nos. 41 at 38 ¶¶ 69, 70; 41-54; 41-15.)  Alvarado did not state in said evaluation that Rodríguez did not meet his expectations.  (Docket Nos. 41 at 38 ¶ 71; 41-15.)

Alvarado also evaluated Rosario's work performance.  Pursuant to goals which Rosario had to meet for the quarterly evaluation corresponding to the April 28, 2012 to July 27, 2012 period,

Civil No. 13-1569 (GAG)

1    Alvarado indicated that Rosario had to exceed 90 percent on-time delivery.  (Docket Nos. 41 at 38

2 ¶ 73; 41-16.)  Alvarado noted that in the months of May and June, the on-time delivery results

3 were only 78.4 percent and 84 percent respectively.  (Docket Nos. 41 at 39 ¶ 74; 41-16.)  Alvarado

4 stated that the goal was "80 percent" despite the fact that he had previously indicated it was 90

5 percent.[4]  Id.  In the evaluation, Alvarado also noted that Rosario sometimes took a hard line

6 attitude, including in situations with her peers, which could lead her to be perceived as someone

7 who is not a team player.  (Docket Nos. 41 at 39 ¶ 75; 41-16.)  Alvarado did not state in Rosario's

8 evaluation for said period that Rosario had not met his expectations.  (Docket Nos. 41 at 39 ¶ 76;

9 41-16.)  Alvarado also evaluated Rosario's work performance for the period of July 28, 2012 to

10 October 26, 2012 and noted that: (1) the Neuro FRY Yield results were under the goal for the

11 entire quarter; (2) Rosario missed the WIP Inventory AOP in August; (3) $21,000.00 over-budget

12 in Manufacturing Cost Centers; (4) Rosario missed her productivity goal throughout the quarter;

13 (5) Rosario missed the Conversion Loss for August; (6) Rosario missed the goal for Kaizen Ideas

14 Implemented.  (Docket No. 41 at 40 ¶ 80; 41-17.)  Alvarado did not state in Rosario's evaluation

15 for July 28, 2012 until October 26, 2012 that Rosario had not met his expectations.  (Docket Nos.

16 41 at 40 ¶ 83; 41-17.)

17      C.  Alleged Incidents of Age Discrimination

18        Plaintiff alleges that several different incidents at work made her feel discriminated against

19 because of her age.  For example, on June 21, 2012, Plaintiff called in sick and informed that she

20 had been ordered to rest by her doctor until July 2, 2012.  (Docket Nos. 39 ¶ 67; 41 ¶ 67.)  Upon

21

22     [4] The court notes that Defendants allege at Docket No. 53 that, for the 2012 fiscal year, Manufacturing
Supervisors were tasked with drafting the objective section of quarterly evaluations titled "Quarterly Goals and Results

23 Achieved." (Docket No. 53 at 5.)  Nevertheless, the court highlights that Defendants also state that Alvarado reviewed
these drafts and completed the "Behaviors and Capabilities" section.  Id.  Thus, the court makes the reasonable

24 inference that Alvarado, as supervisor, made sure the "Quarterly Goals and Results Achieved" section was filled out
accurately by the Manufacturing Supervisors.

Civil No. 13-1569 (GAG)

her return to work on July 2, 2012, Alvarado discussed Plaintiff's performance with her.  (Docket Nos. 39 ¶ 68; 39-21 at 2-3.)  That same day, Plaintiff again went on medical leave from July 2 to July 9, 2012 and upon her return to work on July 9, 2012 Alvarado informed her that she would not receive a salary increase or performance bonus for fiscal year 2011-2012.  (Docket Nos. 39 ¶ 69; 41 ¶ 69.)  At Medtronic, pursuant to Medtronic's policy and practice, employees who receive a "non-attainment" rating in their yearly evaluation shall have a reduction or non-payment of the Medtronic Incentive Plan fiscal year.  (Docket No. 64-7.)  However, Plaintiff alleges that evaluations at Medtronic do not have set ratings of "exceeds," "meets," and/or "does not meet." (Docket No. 41 ¶ 70.)

On July 18, 2012, Alvarado sent an e-mail to other employees at Medtronic requesting feedback regarding Plaintiff.  (Docket Nos. 39 ¶ 71; 41 ¶ 71.)  Rosario and the Human Resources representative at the time, Rafael Figueroa, both provided written responses to Alvarado's e-mail for feedback on Plaintiff.  (Docket Nos. 39 ¶ 72; 41 ¶ 72.)  On July 31, 2012, Plaintiff went on medical leave again and returned to work at Medtronic on September 4, 2012.  (Docket Nos. 39 ¶ 73; 41 at 42 ¶ 95.)

Upon Plaintiff's return, in September, 2012, Plaintiff was placed on a Performance Improvement Plan ("PIP").  (Docket Nos. 39 ¶ 74; 41 at 42 ¶ 95.)  Pursuant to Medtronic's policies, employees who receive a "does not meet" rating in their evaluations are placed on PIP at the end of the year.  (Docket Nos. 39 ¶ 70; 41 ¶ 70.)  As a result of being placed on a PIP, Plaintiff's work position did not change, and she did not lose "benefits."  (Docket Nos. 39 ¶ 74; 41 ¶ 74.)  Defendants allege that on October 22, 2012, and November 20, 2012, Alvarado discussed Plaintiff's PIP progress with Plaintiff.  (Docket No. 39 ¶ 75.)  However, Plaintiff alleges that the meeting to discuss her PIP progress was held exclusively on November 20, 2012, which is when

Civil No. 13-1569 (GAG)

Plaintiff signed the memorandum that outlined her PIP progress.  (Docket Nos. 41 ¶ 75; 67-3 at 22.)  Plaintiff alleges that the purpose of a PIP is to establish the objectives that an employee must look towards achieving in order to improve whatever deficiencies were identified in the employee's evaluation.  (Docket Nos. 41 at 41 ¶ 88.)  Plaintiff further alleges that even though Defendants decided on or about May, 2012 to place Plaintiff on a PIP, it was not until September 17, 2012 that Plaintiff was placed on a PIP.  (Docket Nos. 41 at 42 ¶¶ 91, 95.)  Plaintiff alleges that being placed on a PIP meant that she had to be evaluated more or less on a monthly basis, but that during the course of the PIP in which she was placed neither Alvarado nor anyone else at Medtronic would meet with her to discuss the progress of her performance.  (Docket Nos. 41 at 43 ¶¶ 96, 97.)

Plaintiff alleges that she was treated disparately from the other three Manufacturing Supervisors.  At Medtronic, Supervisors in Plaintiff's position are assigned one or more Coordinators.  (Docket Nos. 39 ¶ 31; 41 ¶ 31.)  However, Defendants allege that Coordinators were assigned to Supervisors depending on business needs and the complexity of the lines assigned to the Supervisors.  (Docket No. 39 ¶ 33.)  Nevertheless, Plaintiff alleges that Medtronic has no such rules, policies and/or guidelines in regards to assignment of coordinators to Supervisors because the assignment of coordinators to Supervisors is "within each manager's prerogative."  (Docket No. 41 ¶ 33.)  As a result, the parties disagree as to the policy regarding assignment of Coordinators to Manufacturing Supervisors.  At the time when all four Supervisors were under Alvarado's supervision, Rivera and Rosario were assigned three coordinators each. (Docket Nos. 39 ¶ 34; 41 ¶ 34.)  Rodríguez had two coordinators ever since she began at Medtronic, one was an official coordinator and the other was training to become a coordinator. (Docket No. 41 ¶ 38.)  Plaintiff had been working with one coordinator since 2008, and she was

11

Civil No. 13-1569 (GAG)

1   never assigned more than one coordinator even though she asked Alvarado for an additional

2   coordinator when he became her supervisor.  (Docket No. 39 ¶ 36; 41 ¶ 36; 41 at 25-26 ¶¶ 4, 5, 9.)

3   Defendants allege that the Network segment is more complex than the Lines segment.  (Docket

4   No. 39 ¶ 34.)  On the other hand, Plaintiff denies that the Network segment was more complex

5   than the Lines segment.  (Docket No. 41 ¶ 37.)

6       Plaintiff also alleges that Alvarado discriminated against Plaintiff in assigning her a

7   Corrective Action/Preventive Action ("CAPA") in order to continue his discriminatory campaign

8   against her.[5]  (Docket No. 1 ¶ 89.)  Alvarado's two criteria for assigning CAPAs amongst his

9   subordinates are: (1) the area or segment this issue to be corrected took place; and, (2) the scope of

10  the problem.[6]  (Docket Nos. 39 ¶ 41; 41 ¶ 41.)  During Plaintiff's employment at Medtronic, she

11  has been assigned a total of two CAPAs.  (Docket Nos. 39 ¶ 47; 41 ¶ 47.)  Plaintiff alleges that,

12  while under Alvarado's supervision, Alvarado assigned CAPAs to her but did not assign CAPAs to

13  any of the other three Manufacturing Supervisors.  (Docket No. 41 at 46 ¶ 119.)  Nevertheless, the

14  parties agree that one of these CAPAs, CAPA NCR-PPC-09-025, was assigned to Plaintiff on

15  January 14, 2009, before Alvarado began working at Medtronic.  (Docket Nos. 39 ¶ 48; 41 ¶ 48.)

16      Alvarado assigned Plaintiff's second CAPA, CAPA 124771 Desiccant Component Mix

17  Up, on April 12, 2012.  (Docket Nos. 39 ¶ 51; 41 ¶ 51.)  Plaintiff alleges that one of the CAPAs

18  Alvarado assigned to Plaintiff was known at Medtronic as the "MTA" CAPA, and it involved a

19  problem with a camera known as OCR.  (Docket No. 41 at 48 ¶ 126.)  Plaintiff alleges that before

20  Alvarado assigned the MTA CAPA to Plaintiff, the CAPA was discussed during a conversation

21

22      [5] CAPA is an FDA acronym that stands for preventive action and corrective action, which is a concept within good manufacturing practices that focuses on the systemic investigation of the root causes of identified problems or identified risks in an attempt to prevent their occurrence or recurrence.  (Docket Nos. 39 ¶ 40; 41 ¶ 40.)

23      [6] An employee may be assigned a CAPA as owner, or she may be assigned tasks within a CAPA.  (Docket Nos. 39 ¶ 42; 41 ¶ 42.)  The leader or owner of a CAPA has the responsibility of leading the investigation, from analyzing the root cause through the ultimate resolution of the issue.  (Docket Nos. 39 ¶ 43; 41 ¶ 43.)

24

Civil No. 13-1569 (GAG)

between Alvarado, Plaintiff, and Castro who had been an employee at Medtronic since 2002 and was a processes engineer in the manufacturing area at Medtronic at the time.  (Docket Nos. 41 at 48 ¶¶ 128, 129, 130.)  Plaintiff alleges that during said conversation, Castro told Alvarado that this was a very technical CAPA which should not be assigned to Plaintiff because it was complicated and should be assigned to someone who had more expertise.  (Docket No. 41 at 49 ¶ 132.) Plaintiff alleges that Alvarado insisted that he would assign the CAPA to Plaintiff.  Id. ¶ 133. Plaintiff alleges that when Alvarado assigned her the MTA CAPA, there were younger employees at Medtronic who had the expertise to lead the MTA CAPA.  Id. ¶ 134.  Plaintiff further alleges that although the norm at Medtronic is that the leader of a CAPA is the one in charge of assembling the team of individuals who will work on the CAPA, when Plaintiff was assigned to be the leader of the MTA CAPA, the team had already been assembled by someone other than Plaintiff.  Id. ¶ 135.   Further, Plaintiff alleges that when she attempted to report a problem regarding the equipment while she was working on the MTA CAPA, Alvarado responded in a threatening tone saying "Go tell quality."  Id. ¶ 136.  Plaintiff alleges that she went to Medtronic's Human Resources office and requested that she be relieved from working on the MTA CAPA because she did not have the expertise to complete it.[7]  Id. ¶ 137.

On November 20, 2012 Plaintiff filed an age discrimination and retaliation charge before the Anti-Discrimination Unit of the Puerto Rico Department of Labor ("ADU").  (Docket Nos. 41 at 44 ¶ 103; 67-5.)

D.  Other Alleged Discriminatory Actions

Plaintiff alleges that an incident involving the Shop Floor Control Project ("SFCP"), also demonstrates Defendants' discrimination, harassment and retaliation towards Plaintiff because of

---

[7] CAPA 124771 was reassigned from Plaintiff to Rosario on January 21, 2013 upon Plaintiff's leave of absence.  (Docket Nos. 39 ¶ 52; 41 ¶ 52.)

Civil No. 13-1569 (GAG)

her age.  (Docket No. 42 at 26.)  The SFCP was a special project whereby Supervisors were required to gather certain data from their respective manufacturing lines during their shift in order to help better measure productivity.  (Docket Nos. 39 ¶ 79; 41 ¶ 79.)  On one particular morning of January, 2013, during the first shift, Alvarado convened briefly with Supervisors Rivera, Rodríguez, and Rosario regarding evaluations of their respective subordinates.  (Docket Nos. 39 ¶ 81; 41 ¶ 81.)  The Supervisors reiterated their complaints that the SFCP was inefficient and was taking too much time and attention to complete.  Id.  Accordingly, the decision was made to cease the SFCP until after employee evaluations were completed.  Id.  Supervisor Rosario stated in her deposition that she told Plaintiff about the decision that same day in the afternoon when she saw Plaintiff working on the SFCP.  (Docket Nos. 39-6 at 59 l. 24-25.)  Plaintiff accepts that Rosario notified her to stop work on the SFCP, but disagrees that she was notified on the same day as the meeting when the decision was made took place.  (Docket No. 41 ¶ 82.)  Plaintiff further alleges that, because she was not notified of the cancellation of the SFCP immediately, she was the only Manufacturing Supervisor who continued to work on it and was not able to complete the evaluations of her subordinate employees for a meeting with Alvarado.  (Docket No. 41 at 51 ¶ 146.)  Plaintiff alleges that during the meeting in which Alvarado asked the Manufacturing Supervisors about the evaluations of their subordinates, Plaintiff explained to Alvarado that he had given instructions to stop the SFCP, but that she had not been informed of said order.  Id.

In January, 2013, Plaintiff alleges that she received a telephone call from Alvarado regarding the amounts of units produced on a Friday.  (Docket No. 41 at 52 ¶ 153.)  According to Plaintiff, the goal for each manufacturing line at the end of each shift at Medtronic is to produce one hundred and twenty units.  (Docket No. 41 at 52 ¶ 149.)  Plaintiff alleges, however, that if there are any issues with the machinery, it can reduce the output to less than one hundred and

Civil No. 13-1569 (GAG)

twenty units per shift, which could result in only producing between eighty (80) and one hundred (100) units.  (Docket No. 41 at 52 ¶ 149.)   Plaintiff alleges that this is a normal occurrence at Medtronic.  Id.  Plaintiff alleges that, on a Saturday morning in January, 2013, Alvarado left a voicemail on Plaintiff's telephone regarding that "only 100 units" had been completed the Friday before Plaintiff's shift.  Id. ¶ 152.  Plaintiff alleges that in the voicemail Alvarado also said, "We cannot continue living like this."  Id. ¶ 154.

Plaintiff went on a six-month leave to the State Insurance Fund in January, 2013, and returned to Medtronic on June 4, 2013.  (Docket Nos. 39 ¶ 76; 41 ¶ 76.)  Then, upon successful completion of her PIP, Plaintiff was awarded a salary increase.  (Docket Nos. 39 ¶ 77; 41 ¶ 77.) On April 20, 2013, Rubén Rossy was assigned as Plaintiff's supervisor.  (Docket Nos. 39 ¶ 78; 41 ¶ 78.)

Plaintiff alleges that during the entirety of her time under Alvarado's supervision at Medtronic, she had approximately three or four one-on-one meetings with Alvarado.  (Docket No. 41 ¶ 54.) Plaintiff alleges that they were supposed to meet every two weeks but that Alvarado would fail to show up to the meetings with Plaintiff.  Id.  Defendants allege that Alvarado set out to hold one-on-one meetings with manufacturing managerial employees on a bi-weekly basis, but because he felt there was sufficient daily interactions with his personnel, he decided to hold the meetings at least once a month.  (Docket No. 39 ¶ 54.)

## II.   Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. R. 56(a).  "An

**Civil No. 13-1569 (GAG)**

issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).   The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.   Celotex, 477 U.S. at 325.   "The movant must aver an absence of evidence to support the nonmoving party's case.   The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).   The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   FED. R.CIV. P. R. 56(c)(1)(B).   If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences.   Id. at 255.   Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.   Id.   Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation."   Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

Civil No. 13-1569 (GAG)

### III.   Discussion

In their motion for summary judgment, Defendants argue that: (1) Plaintiff cannot marshal a *prima facie* case because she cannot show she was meeting Medtronic's legitimate performance expectations; and (2) the record is wanting of any evidence of pretext.  (Docket No. 36 at 1.) Plaintiff, on the other hand, argues that a genuine issue of fact exists as to: (1) whether Plaintiff met Medtronic's expectations; and (2) whether Alvarado's evaluation of Plaintiff was intended to mask his discriminatory and disparate treatment vis-à-vis her substantially younger and similarly situated peers.  (Docket No. 42.)

### A.   Plaintiff's Claim Under Title VII

Plaintiff's first cause of action is for "age discrimination under Title VII."  (Docket No. 1 at 15.)  Title VII provides, in pertinent part, that all personnel actions affecting employees or applicants for employment in executive agencies shall be made free from any discrimination based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-16(a).  As such, the ADEA and Title VII cover separate and distinct subjects.  Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005) (citing Lennon v. Rubin, 166 F.3d 6, 8 (1st Cir. 1999) (explaining that age discrimination claims are not cognizable under Title VII)).  Thus, said claim does not find support in the cited law because there is no cause of action for age discrimination under Title VII.

Accordingly, the court hereby **GRANTS** Defendants' motion for summary judgment at Docket No. 36 as to the age discrimination under Title VII claim and said claim is hereby **DISMISSED**.

### B.   Plaintiff's claim under the ADEA

In moving for summary judgment on Plaintiff's claim of age discrimination, Defendants argue that Plaintiff cannot establish a prima facie case of age discrimination under the ADEA.

Civil No. 13-1569 (GAG)

1    (Docket No. 36 at 1.)  The ADEA makes it unlawful for an employer to "fail or refuse to hire or

2    discharge any individual or otherwise discriminate against any individual . . . because of such

3    individual's age." 29 U.S.C. § 623(a)(1).

4                    i.   *Plaintiff's Prima facie case*

5            The court addresses Plaintiff's ADEA age discrimination claim under "the familiar three-

6    step framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973)."  See

7    Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 23 (1st Cir. 2015).  In the first of the

8    three McDonnell Douglas stages, the plaintiff has the initial burden of establishing a *prima facie*

9    case of discrimination.  Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 136 (1st Cir.

10   2012).  To make the threshold showing in an ADEA action, the plaintiff must show: (1) she was at

11   least forty years old at the time of the adverse employment action; (2) she was qualified for the

12   position she held; (3) she suffered an adverse employment action; and (4) the employer filled the

13   position, thereby showing the continuing need for the services that she had been rendering.

14   Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014); Mesnick v. Gen. Elec. Co., 950 F.2d

15   816, 822 (1st Cir. 1991).

16           Plaintiff was born in 1957, and began working at Medtronic in 2006.  (Docket Nos. 39 ¶¶

17   1-3; 41 ¶¶ 1-3.)  Therefore, Plaintiff was forty-nine (49) when she began working at Medtronic.,

18   and thus, satisfies the first prong of an ADEA age discrimination action because, at all relevant

19   times, Plaintiff was over forty years old.  See id.

20           Accordingly, the court proceeds to the second prong: whether Plaintiff has shown that she

21   was qualified for the position.  Alvarado's third quarterly evaluation of Plaintiff, given at the end

22   of the 2011-2012 fiscal year, reflected that Plaintiff did not meet the expectations of her

23   Manufacturing Supervisor position for fiscal year 2011-2012.  (Docket Nos. 39 ¶ 65; 41 ¶ 65.)

24

Civil No. 13-1569 (GAG)

1    Defendants further allege that, as explained in the evaluations, Plaintiff did well in the objective

2    criteria and regularly met output goals, but she consistently failed to deliver on other aspects of the

3    job such as leadership, knowledge and accountability.  See Docket Nos. 35 at 6; 39 ¶ 62; 41 ¶ 62;

4    39-20; 39 ¶ 65; 41 ¶ 65.)  Plaintiff, on the other hand, alleges that the assertions Alvarado made in

5    her evaluations were regarding subjective matters, and that the evaluation clearly reflects that

6    Plaintiff met and/or exceeded the objective expectations and met Medtronic's productivity goals,

7    thus demonstrating that she was qualified for the position.  Plaintiff argues that Defendants were

8    unlawfully discriminating against her when they gave her the negative evaluation.  (Docket No. 42

9    at 22-23.)  However, Defendants argue, as Alvarado explained in his deposition as the evaluating

10   authority, that the method and the manner in which the employee attains those goals is just as

11   important as achieving objective numerical output goals.  (Docket Nos. 53 at 6; 53-1 at 23.)

12        Additionally, Plaintiff points to the evaluations of the other three Manufacturing

13   Supervisors to point out that even though the other Manufacturing Supervisors often failed to meet

14   productivity goals, Alvarado never gave them a "does not meet" in their evaluations.  (Docket No.

15   42 at 7.)  Defendants reply by arguing that Plaintiff's performance evaluations are not strictly

16   comparable to the evaluations of Rivera and Rosario because while Alvarado began evaluating

17   Plaintiff in September, 2011, and thus had the benefit of evaluating her for two and a half quarters

18   of the 2011-2012 fiscal year, Rivera and Rosario did not come under Alvarado's supervision until

19   the last and fourth quarter of said fiscal year.  (Docket No. 53 at 8.)

20        Turning to the law, "[a]n issue is genuine if 'it may reasonably be resolved in favor of

21   either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the

22   litigation under the applicable law.'"  Iverson, 452 F.3d at 98 (alteration in original) (internal

23   citations omitted).  The record shows that Plaintiff met the objective goals of her position, but it

24

**Civil No. 13-1569 (GAG)**

also shows that Alvarado was not satisfied with Plaintiff's method and manner of achieving those goals.  E.g.  Docket Nos. 41-19; 39-20.  Because this issue possesses the capacity to sway either way whether or not Plaintiff met the legitimate expectations of a Manufacturing Supervisor and was thus qualified for her position, at this stage, the court finds that there is a genuine issue of material fact as to this issue.  Despite the court's determination that an issue of fact exists as to whether or not Plaintiff was qualified for her position, the court addresses the remaining prongs of Plaintiff's *prima facie* case because she has the burden of proving all of the elements.

The court now turns to the third prong; whether Plaintiff suffered an adverse employment action at the hands of Defendants.  It is undisputed that Plaintiff did not receive an increase in salary or the bonus performance payment at the end of the 2011-2012 fiscal year.  (Docket Nos. 39 ¶ 85; 39-21 at 2; 41 ¶ 85.)  Pursuant to Medtronic's policies, employees who receive a "does not meet" rating in their evaluations are placed in a PIP at the end of the year.  (Docket Nos. 39 ¶ 70; 41 ¶ 70.)  It is also undisputed that Plaintiff did not receive the increase in salary or the bonus payment because Alvarado stated that she "did not meet" the expectations of her Manufacturing Supervisor position for the 2011-2012 fiscal year.  (Docket Nos. 39 ¶ 65; 41 ¶ 65.)  The court finds that Plaintiff's argument relies on a finding that the negative performance evaluation prevented Plaintiff from receiving an increase in salary or the bonus payment.

The court now addresses the fact that Plaintiff was not discharged from her position, nor did she resign and claim constructive discharge and, thus, whether she suffered an adverse employment action.  Because Plaintiff was never discharged, she does not claim to have been constructively discharged, and she continues to be employed at Medtronic, Plaintiff is in a peculiar situation as it is unclear whether she has suffered an adverse employment action under the established ADEA precedent.  See Docket No. 36. at 1.  The court's research has shown that the

20

**Civil No. 13-1569 (GAG)**

First Circuit has yet to specifically address whether a Plaintiff who claims no type of discharge can still satisfy the adverse employment action prong of an ADEA claim.  The undersigned's esteemed colleagues have frequently decided that the third prong of an ADEA claim requires that the employee be discharged-either actually or constructively.   See Estades Negroni v. Associated Corp. of N. Am., 208 F. Supp. 2d 144, 148 (D.P.R. 2002); see also Rivera v. Caribbean Refrescos Inc., 332 F. Supp. 2d 435, 448 (D.P.R. 2004).  In Estades Negroni, Estades, the employee, was not terminated from her employment nor constructively discharged by Associates, her employer, inasmuch as she did not resign, but rather went on paid disability leave under Associate's health benefits plan.  Estades Negroni, 208 F. Supp. 2d at 148.  Subsequently, Estades voluntarily caused the cancellation of her long term disability benefits, and as a direct consequence thereof further caused her employment status within Associates to cease.  Id.  Similarly, here, Plaintiff did not resign or claim to have been constructively discharged.

In Yenush v. Pioneer Group, Inc., 2004 WL 187385 at *2 (D. Mass. 2004), the employee received a written warning from Pioneer, the employer.   In Yenush, the District Court for the District of Massachusetts, decided that even though it was not altogether convinced that the May 31 warning constituted an actionable adverse action under Title VII, the court was going to assume for the purposes of the motion for summary judgment that the warning properly constituted an adverse action because the parties had not briefed that specific issue.  Id. at n.7.

The District Court for the Southern District of New York has specifically addressed the issue of negative performance evaluations that plaintiffs claim have been given for discriminatory reasons and whether the evaluations constitute adverse employment actions for purposes of showing a prima facie claim.  See Trachtenberg v. Dep't of Educ. of City of N.Y., 937 F. Supp. 2d 460, 469 (S.D.N.Y. 2013); see also Siddiqi v. N.Y.C. Health Hosps. Corp., 572 F. Supp. 2d 353,

Civil No. 13-1569 (GAG)

367 (S.D.N.Y. 2008).    In <u>Trachtenberg</u>, the court held that two negative performance reviews, combined with letters containing scurrilous charges, and the significantly adverse consequences that flowed therefrom together did rise to the level of an adverse employment action.   <u>See</u> <u>Trachtenberg</u>, 937 F. Supp. 2d at 469.   That court pointed out that to qualify as an adverse employment action, a negative performance evaluation "must trigger negative consequences to the conditions of employment."  <u>Id.</u>  In the absence of negative consequences attaching to the alleged negative performance evaluations or other reprimands, courts in the Southern District of New York have repeatedly found no adverse employment action.  <u>Id.</u>; <u>see</u> <u>e.g.</u>, <u>Frankel v. City of N.Y.</u>, 2009 WL 465645 at *3 (S.D.N.Y. Feb. 25, 2009).  However, where negative performance reviews do trigger some adverse consequences to plaintiff's employment, the courts in that district have left it to the trier of fact to determine whether those consequences rise to the level of adverse employment action.  <u>See</u> <u>e.g.</u>, <u>Dressler v. N.Y.C. Dep't of Educ.</u>, 2010 WL 1038600, at *6-7 (S.D.N.Y. Mar. 29, 2012) (evidence that teacher's unsatisfactory end-of-year rating "precluded him from the opportunity of participating in the Per Session Home Instruction Employment Program is sufficient to establish a basis on which a reasonable trier of fact could find a material adverse change"); <u>Shapiro v, N.Y.C. Dep't of Educ.</u>, 561 F. Supp. 2d 413, 423 (S.D.N.Y. 2008) (triable issue of fact existed as to whether adverse employment action occurred where teachers who received unsatisfactory end-of-year ratings adduced evidence that consequences of such ratings include, *inter alia*: removal from per session paid position; inability to transfer within the school district; inability to work in summer school; and damaged professional reputation).

In the present case, it is undisputed that Alvarado stated that Plaintiff "did not meet" the expectations of her Manufacturing Supervisor position for the 2011-2012 fiscal year.  (Docket Nos. 39 ¶ 65; 41 ¶ 65.)  This court finds those cases analogous to the instant case because, like

22

**Civil No. 13-1569 (GAG)**

here, the plaintiffs were claiming that a negative evaluation should suffice to show an adverse employment action for purposes of establishing a prima facie ADEA age discrimination claim. Accordingly, because Alvarado's statement that Plaintiff "did not meet" her position's expectations in the evaluation prevented Plaintiff from obtaining a performance bonus, the court finds that, this is question of credibility best left to the trier of fact to determine, as the issue is whether the consequences of said negative evaluation rises to a level of an adverse employment action.

> ii.   *Defendants' Burden*

Assuming that a reasonable jury concludes that Plaintiff succeeds in establishing a *prima facie* case at the first stage, a presumption of discrimination then arises and the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse employment action.  See Rivera-Aponte v. Rest. Metro. #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003).  At the second stage of the three McDonnell Douglas stages, the employer's burden is not one of persuasion; the employer need do no more than articulate a reason which, on its face, would justify a conclusion that the plaintiff subjected to an adverse employment action for a nondiscriminatory motive.  See Dávila v. Corporación de P.R. Para La Difusión Pública, 498 F.3d 9, 16 (1st Cir. 2007).  Here, Alvarado alleges that, for him as the evaluating authority, achieving objective numerical output is just as important as the method and manner in which the employee attains these goals.  (Docket No. 53 at 6.)  He alleges that although Plaintiff did indeed do well with the help of her coordinator in the objective criteria and regularly met output goals, she consistently failed to deliver on other aspects of the job such as leadership, knowledgeability, and accountability.  Id.  The court finds that this is enough to enable a reasonable fact-finder to

Civil No. 13-1569 (GAG)

conclude that there existed a nondiscriminatory reason for Plaintiff's dismissal.  See Meléndez v. Autogermana, Inc., 622 F.3d 46, 51 (1st Cir. 2010).

When, as in this case, the employer produces a facially adequate explanation for the discharge, the presumption of discrimination created by Plaintiff's *prima facie* case disappears from view.  See Ramírez-Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 78 (1st Cir. 2005).

> iii.    Pretext

At the final stage of the McDonnell Douglas burden-shifting scheme, the burden shifts back to Plaintiff who, unaided by the presumption that was previously raised in the prima facie case, must put forth sufficient facts for a reasonable fact-finder to conclude that Defendants' proffered reason for the adverse employment action is a pretext and that the true reason behind the adverse employment action was age-based discriminatory animus.  Meléndez, 622 F.3d at 51.  At that juncture, the burden reverts back to Plaintiff, who must show that the reason given by the employer for the discharge is pretext for age discrimination.  Dávila, 498 F.3d 9 at 16.   At summary judgment, this question reduces to whether Plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that she suffered an adverse employment action because of her age.  Ramírez-Rodríguez, 425 F.3d at 78.  It is not enough for a Plaintiff merely to impugn the veracity of the employer's justification; she must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.  See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991).

Here, Plaintiff in seeking to carry this burden, alleges that because she met the objective production goals she should not have received negative comments, because the comments were

**Civil No. 13-1569 (GAG)**

1  subjective and had nothing to do with her objective performance.  (Docket No. 41 ¶ 62.)  Plaintiff

2  also cites the evaluations of other employees who did not meet objective production goals, and

3  who received negative comments from Alvarado in their evaluations, but nonetheless were never

4  told by Alvarado that they did not meet his legitimate expectations.  Plaintiff then argues that

5  because, all four Manufacturing Supervisors at Medtronic were similarly situated Alvarado was

6  using the evaluations as pretext to discriminate against Plaintiff due to her age.  (Docket No. 42 at

7  23.)  On the other hand, Defendants argue that none of Plaintiff's claims show pretext because: (1)

8  the facts demonstrate that for three consecutive quarters Plaintiff failed to meet the expectations of

9  her position; (2) Plaintiff's own deposition testimony establishes that she enjoyed the same

10  resources, and was tasked with the same workload, as her peers; (3) Plaintiff was not penalized for

11  her leave periods nor for filing a claim against Medtronic; (4) her reduced salary was based on

12  Medtronic policy; and (5) after a period of deficient performance on Plaintiff's part, Medtronic

13  devised a Performance Improvement Plain for her and Alvarado assisted and guided Plaintiff

14  through to successful completion of the plan.  The court finds that Plaintiff has shown sufficient

15  evidence so as to create a genuine issue of material fact as to whether a reasonable jury can draw

16  an inference that age discrimination was the determinative factor in Plaintiff's negative

17  performance evaluation.

18      In light of the aforementioned discussion, the court finds that several genuine issues of

19  material fact arise as part of the analysis of Plaintiff's age discrimination claim under the

20  McDonnell Douglas burden-shifting framework.

21      In light of the above, the principal contested issue of Defendants' summary judgment

22  motion –whether Plaintiff met her employer's legitimate work expectations– is one best suited for

23

24

Civil No. 13-1569 (GAG)

the jury.  Accordingly, the court hereby **DENIES** the motion for summary judgment at Docket No. 36 as to the age discrimination claim under the ADEA.

      C.  <u>Retaliation Under ADEA</u>

      The court now turns to Plaintiff's retaliation claim under the ADEA.  In addition to prohibiting age discrimination, the ADEA also protects individuals who invoke the statute's protections.  <u>Ramírez-Rodríguez v. Boehringer Ingelheim Pharm. Inc.</u>, 425 F.3d 67, 84 (1st Cir. 2005).  Even if Plaintiff's age discrimination claim fails, she may still assert a retaliation claim under the ADEA.  <u>Sanchez-Medina v. Unicco Service Co.</u>, 2010 WL 3955780 at *9 (D.P.R. Sept. 30, 2010).  To make out a *prima facie* case of retaliation under the familiar burden-shifting framework articulated in <u>McDonnell Douglas</u>, 411 U.S. at 801-03, Plaintiff must prove that: (1) she engaged in protected activity under the ADEA; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected activity."  <u>Collazo v. Bristol-Myers Squibb Mfg., Inc.</u>, 617 F.3d 39, 46 (1st Cir. 2010).  Once the *prima facie* case of retaliation is shown, a presumption of discrimination arises and the burden of production then shifts to the employer to show a "legitimate, non-discriminatory reason" for the adverse employment action.  <u>Collazo</u>, 617 F.3d at 46.  If the defendant meets the burden of production, the burden then shifts back to the plaintiff to show that the proffered reason is actually pretextual, and that the plaintiff would not have been constructively discharged absent retaliatory animus.  <u>See</u> <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2532-33 (2013) (requiring "but-for" causation under the similarly-worded anti-retaliation provision of Title VII); <u>see</u> <u>also</u> <u>Roman v. Potter</u>, 604 F.3d 34, 39 (1st Cir. 2010).

Civil No. 13-1569 (GAG)

         *i.*   *Plaintiff's prima facie case*

In regards to the elements of the *prima facie* case, an individual engages in protected conduct when he or she "has opposed any practice made unlawful by the ADEA, or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under the ADEA. See 29 U.S.C. § 623(d). As to the second prong, the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Nieves Perez v. Doctor's Center Bayamon, 2011 WL 1843057 at *3 (D.P.R. 2011). The alleged retaliatory action must be material, producing a significant, not trivial, harm. Carmona-Rivera v. Commonwealth of P.R., 464 F.3d 14, 19 (1st 2006). The First Circuit has considered demotions, disadvantageous transfers or assignments, refusals to promote and unwarranted negative job evaluations as adverse employment actions. Id. Finally, for the third prong, the First Circuit has found that "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004).

Plaintiff engaged in protected conduct by filing an administrative charge before the ADU on November 20, 2012. (Docket Nos. 41 at 44 ¶ 103; 67-5). In January, 2013, Alvarado held a meeting with the other three Manufacturing Supervisors regarding evaluations of their respective subordinates and Plaintiff was not present or notified of the meeting. (Docket Nos. 39 ¶ 81; 41 ¶ 81.) At that meeting, the Supervisors reiterated their complaints that the SFCP was inefficient and taking too much time and attention to complete. (Docket Nos. 39 ¶ 81; 41 ¶ 81.) Accordingly, the decision was made to cease work on the SFCP until after employee evaluations were completed. Id. The SFCP was a special project whereby Manufacturing Supervisors were required to gather

**Civil No. 13-1569 (GAG)**

certain data from their respective manufacturing lines during their shift in order to help better measure productivity.  (Docket Nos. 39 ¶ 79; 41 ¶ 79.)  Supervisor Rosario, in her deposition, stated that she told Plaintiff about the decision later that same day in the afternoon when she saw her still working on the SFCP.  (Docket Nos. 39-6 at 59-1; 24-25.)  Plaintiff accepts that Rosario notified her to stop work on the SFCP, but disagrees that she was notified on the same day as the meeting.  (Docket No. 41 ¶ 82.)  Plaintiff further alleges that because she was not notified of the cancellation of the SFCP, she was the only Manufacturing Supervisor who continued to work on it and was, thus, not able to complete the evaluations of her subordinate employees for a meeting with Alvarado.  (Docket No. 41 at 51 ¶ 146.)  Plaintiff alleges that during the meeting in which Alvarado asked the Manufacturing Supervisors regarding the evaluations of their subordinates, she explained to Alvarado that he had given instructions to stop the SFCP, but that this order had not been informed to her.  Id.  Plaintiff alleges that since she filed a charge of age discrimination on November 20, 2012, there was a discriminatory animus behind Alvarado's decision to exclude her from the meeting in which he issued the order.  (Docket No. 42 at 27.)

As explained above, Plaintiff alleges that she received a phone call from Alvarado, regarding how "only 100 units" had been completed on the Friday before Plaintiff's shift and that they "could not continue living like this."  See Docket No. 41 at 52 ¶¶ 152, 153, 154.)  Plaintiff alleges that voicemail was in retaliation against her for engaging in protected conduct.  (Docket No. 42 at 28.)

At this stage, the issue thus becomes whether a reasonable jury could find that the alleged retaliatory actions were material, producing Plaintiff a significant, not trivial, harm.  See Carmona-Rivera, 464 F.3d at 19.  In regards to the meeting held in Plaintiff's absence, the record is unclear as to how soon after the meeting Plaintiff was notified of the decision to cancel the SFCP.   See

Civil No. 13-1569 (GAG)

Docket No. 39-6 at 59 l. 24-25; 41 ¶ 82.  The record is also wanting of any evidence in regard to what type of harm the alleged retaliatory actions had on Plaintiff.  Thus, at this stage, the court finds that there is a genuine issue as to the material fact of whether Plaintiff suffered material harm as a result of the alleged retaliatory actions.

Additionally, close temporal proximity between the adverse employment action and a Plaintiff's protected activity, without further evidence, may give rise to a causal connection. Calero-Cerezo, 355 F.3d at 25-26.  At most two months passed between Plaintiff's protected activity and the alleged retaliatory actions, which could give rise to a causal connection.  See Planadeball v. Wyndham Vacation Resorts, Inc., 2015 WL 4385928 at *7 (1st Cir. 2015) (finding that two-month gap between protected activity and a material adverse action is sufficiently short to establish a prima facie case of retaliation).  Here, because the court finds that a reasonable jury may or may not find that Plaintiff suffered material harm from the retaliatory action, the court also finds that at there is a genuine issue of material fact as to whether the two months that elapsed between the alleged retaliatory action and the protected activity is enough to satisfy Plaintiff's minimal burden under the law.

ii.   *Defendants' burden*

If a reasonable jury determines that Plaintiff satisfies her burden of showing a *prima facie* case of retaliation, the burden then shifts to Defendants who in turn have to show a "legitimate, non-discriminatory reason" for the adverse employment action.  See Collazo, 617 F.3d at 46. Defendants allege that the so-called meeting Plaintiff refers to, where Alvarado ordered the Manufacturing Supervisors to stop working on the SFCP, was held one early afternoon in January, 2013 when Alvarado convened briefly with Rivera, Rodríguez, and Rosario – who just happened to be at the plant during the first shift because she had been assigned a split shift – to discuss their

Civil No. 13-1569 (GAG)

1   respective subordinate's evaluations.  (Docket No. 39 at 15 ¶ 81.)  Defendants also allege that

2   Plaintiff was notified on the same day the decision was made and within two hours of the

3   beginning of her shift, and in the manner that information would typically be passed from one shift

4   to another.  (Docket No. 53 at 18-19 ¶¶ c, d).  Thus, Defendants have not exactly shown a

5   "legitimate, non-discriminatory reason" for why Alvarado held a meeting with all but one of the

6   Manufacturing Supervisors to discuss a project on which all four of the Manufacturing Supervisors

7   were working on.  Additionally, Defendants do not address the voicemail incident anywhere in

8   their pleadings or motions.

9              *iii.    Plaintiff's but-for causation*

10             If Defendants succeed in showing that Alvarado had legitimate, and non-discriminatory

11   reasons for the alleged retaliatory actions, Plaintiff must then show that but-for Alvarado's

12   retaliatory animus she would have been included in the meeting, and she would not have received

13   the alleged voicemail.

14             In light of the foregoing, the court concludes that genuine issues of material fact remain

15   and the resolution of such could affect the outcome of Plaintiff's retaliation claim under the

16   ADEA.  Accordingly, the court **DENIES** Defendants' motion for summary judgment at Docket

17   No. 36 as to Plaintiff's retaliation claim under the ADEA.

18             D.  Hostile Work Environment Under ADEA

19             The court now turns to Plaintiff's allegations in regards to the age-based hostility Plaintiff

20   suffered as an employee at Medtronic.  (Docket No. 1 ¶ 70; 67-5.)  Under the ADEA, a plaintiff

21   must file an employment discrimination charge with the EEOC within 300 days of the alleged

22   discrimination.  29 U.S.C. § 626(d)(2) (stating ADEA's charge-filing requirement).  In Puerto

23   Rico, the employee must file a charge with the EEOC or Puerto Rico's Anti-Discrimination Unit

24

30

Civil No. 13-1569 (GAG)

within 300 days of the alleged discrimination.  See Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 n. 4 (1st Cir. 2003); see also Cintrón-García v. Supermercados Econo, 818 F. Supp. 2d 500, 506-507 (D.P.R. 2011).  A plaintiff generally cannot litigate claims based on conduct falling outside of this period.  Provencher v. CVS Pharmacy, 145 F.3d 5, 13-14 (1st Cir. 1998).  But where the violation is of a continuing nature (as Plaintiff claims in her ADU/EEOC charge), the charge filed may be timely as to all the discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period.  See Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994).  The complaint must contain a statement describing generally the actions or practices that form the basis of the complaint.  Velázquez-Ortíz, 657 F.3d at 71.

In Plaintiff's charge filed with the ADU on November 20, 2012, she mentions a pattern of discriminatory behavior towards her, and requests that her right to work in an environment free of age-based discrimination and retaliation be enforced.  (Docket No. 67-5.)  Accordingly, the court will consider all the discriminatory acts that occurred within the three hundred days of Plaintiff's ADU charge on November 20, 2012.  As such, any act alleged to have occurred between January 25, 2012 and November 20, 2012 will be considered as timely filed for purposes of the analysis of Plaintiff's hostile work environment claim.

Hostile work environment claims originated in sex discrimination litigation, but have since been recognized for members of any protected class.  Rivera-Rodríguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 24 (1st Cir. 2001) (discussing origin of hostile work environment claims under ADEA).  The First Circuit, in recognizing hostile work environment claims under the ADEA, held that a plaintiff must show that: (1) he/she is a member of a protected class; (2) he/she was subjected to unwelcome harassment; (3) the harassment was based on age; (4) the harassment

Civil No. 13-1569 (GAG)

1   was sufficiently pervasive or severe so as to alter the conditions of Plaintiff's employment and

2   create an abusive work environment; (5) the objectionable conduct was both objectively and

3   subjectively offensive such that a reasonable person would find it hostile or abusive and that the

4   plaintiff did in fact perceive it to be so; and (6) some basis for employer liability has been

5   established.  See O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).  The Supreme

6   Court noted that the test for proving a hostile work environment is not, and by its nature cannot be,

7   mathematically precise.  See Harris v. Forklift Systems Inc., 510 U.S. 17, 22 (1993).  A court

8   determining whether an environment is sufficiently hostile or abusive must examine the totality of

9   the circumstances including the frequency of the discriminatory conduct; its severity; whether it is

10  physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

11  interferes with an employee's work performance.  Id. at 23.  Simple teasing, offhand comments,

12  and isolated incidents (unless extremely serious) do not create a hostile work environment.

13  Farragher v. City of Boca Raton, 524 U.S. 775, 778 (1998).  The court's function is one of

14  screening to determine whether, on particular facts, a reasonable jury could reach such a

15  conclusion.  See Noviello v. City of Boston, 398 F.3d 76, 94 (1st Cir. 2005).

16        It is undisputed that Plaintiff belongs to a protected class because was over forty years old

17  during the relevant time period.  Plaintiff alleges that she was subjected to the unwelcome

18  harassment of being assigned certain tasks as Manufacturing Supervisor, and receiving negative

19  performance evaluations that she deemed unwarranted.  Plaintiff further alleges that she felt age-

20  based discrimination because of Alvarado's conduct as her supervisor.  She alleges that despite

21  having complied with productivity goals and objectives of her position, Alvarado consistently gave

22  her negative comments in her performance evaluation.  (Docket No. 41 at 27-33 ¶¶ 18-48.)

23  Plaintiff also alleges that while under Alvarado's supervision she was never assigned more than

24

**Civil No. 13-1569 (GAG)**

one coordinator even though she asked Alvarado for an additional coordinator ever since Alvarado became her supervisor, while the other three Manufacturing Supervisors always had more than one coordinator.   (Docket No. 41 at 25-26 ¶¶ 4,5,9.)   Plaintiff alleges that Alvarado's treatment towards her must have been based on age because she perceived it was different from Alvarado's treatment towards the other, younger, Manufacturing Supervisors.[8]   (Docket No. 42 at 4.)

She further alleges that the hostile manner in which Alvarado treated her caused her to seek professional medical treatment while on leave to the State Insurance Fund Corporation.   Plaintiff also alleges that Alvarado placed her in a PIP in an attempt to have a reason to terminate her from her employment.   Plaintiff also alleges that Alvarado assigned CAPAs to her, but did not assign CAPAs to any of the other three Manufacturing Supervisors.   (Docket No. 41 at 46 ¶ 119.) Plaintiff further alleges that Alvarado assigned her an MTA CAPA which he should not have because it was a very technical CAPA and Plaintiff did not have the necessary expertise.   (Docket No. 41 at 48 ¶ 131.)   She further alleges that due to the negative comments and ratings that Alvarado inserted into Plaintiff's performance evaluations, Plaintiff did not receive a salary increase or a performance bonus for the 2011-2012 fiscal year.   Defendants, on the other hand, allege that the Network segment was more complex than the lines segment, explaining why Network segment Supervisors had additional coordinators.   (Docket No. 39 ¶ 34.)

Assuming that all of Plaintiff's allegations are true and considering the evidence in the record, the Court finds that there is insufficient evidence showing that Plaintiff's workplace at Medtronic was permeated with sufficiently severe or pervasive discriminatory intimidation, ridicule, and insult as to create an abusive working environment and alter her conditions of

---

[8] Plaintiff cannot use the evaluations of the younger supervisors' to further her hostile work environment claim because she had no knowledge of said evaluations when she allegedly was subjected to a hostile work environment.

Civil No. 13-1569 (GAG)

1   employment.   Taking Plaintiff's allegations as true, it is possible that the negative evaluation

2   altered her working conditions by preventing her from receiving a performance bonus.

3   Nevertheless, Plaintiff does not allege that Alvarado's acts were aimed at, or succeeded, in

4   humiliating or abusing Plaintiff.

5        Plaintiff does not point to even one specific discriminatory comment that Alvarado might

6   have made directed at her.   The incidents mostly involve isolated work assignments that Plaintiff

7   perceived as discriminatory.   Nothing in the record evidence could make a reasonable factfinder

8   determine that Plaintiff was subjected to harassment sufficiently severe and pervasive to alter the

9   conditions of her work environment on an age-based animus.   "Teasing, offhand comments, and

10  isolated incidents" which are not very serious do 'not amount to discriminatory changes in the

11  terms and conditions of employment.'"   Gutierrez-Lines v. Puerto Rico Elec. & Power Auth., 751

12  F. Supp. 2d 327, 342-43 (D.P.R. 2010) (quoting  Faragher, 524 U.S. at 788); see also Pomales v.

13  Celulares Telefonica, Inc., 447 F.3d 79, 84 (1st Cir. 2006) (granting summary judgment where

14  record contained no evidence that conduct negatively affected plaintiff's ability to work);  Lee-

15  Crespo, 354 F.3d at 46 (affirming summary judgment for an employer in a hostile environment

16  case where there was no evidence that the conduct caused "an impediment to [the plaintiff's] work

17  performance"); Medina v. Adecco, 561 F. Supp.2d 162, 173 (D.P.R. 2008).

18       As a result, even viewing the record in the light most favorable to Plaintiff and drawing all

19  inferences in her favor, the court finds that the record is devoid of evidence that could suggest

20  Plaintiff was subjected to a hostile work environment.   Accordingly, the court hereby **GRANTS**

21  Defendants' motion for summary judgment at Docket No. 36 as to Plaintiff's hostile work

22  environment claim and said claim is hereby **DISMISSED**.

23

24

Civil No. 13-1569 (GAG)

1

    E.  Willful Violation Under ADEA

2

    The court now turns to Plaintiff's claim for willful violation under the ADEA.  (See Docket

3 No. 1 ¶¶ 143-145.)  A violation of the ADEA is willful if the employer knows or shows a reckless

4 disregard for the matter of whether its conduct was prohibited by the ADEA.  Trans World

5 Airlines, Inc. v. Thurston, 469 U.S. 111, 126 (1985).  Section 7(b) of the ADEA provides for

6 liquidated damages in the case of a willful violation.  Hazen Paper Co. v. Biggins, 507 U.S. 604,

7 613 (1993).  The Supreme Court observed that Congress aimed to create a "two-tiered liability

8 scheme," under which some, but not all, ADEA violations would give rise to liquidated damages.

9 Id.  A finding of willfulness requires something more than merely showing that an employer knew

10 about the ADEA and its potential applicability in the workplace.  Thurston, 469 U.S. 111 at 127-

11 28.  Willfulness requires an element akin to reckless disregard of, or deliberate indifference to an

12 employer's ADEA-related obligations.  Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 721 (1st Cir.

13 1994) (citing Benjamin v. United Merchants & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir. 1989)

14 (explaining that an ADEA violation is willful if the evidence shows that the employer has not

15 merely "acted negligently, inadvertently and innocently," but has been "indifferent to the

16 requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion").

17     Plaintiff raises a claim for willful violation in her complaint by stating that "Defendants'

18 discriminatory practices against [Plaintiff] were malicious and/or carried out with reckless

19 indifference to her federally protected right to be free from discrimination on the basis of age."

20 (Docket No. 1 ¶ 144.)  However, Plaintiff does not point to specific evidence that shows that

21 Alvarado had been indifferent to the requirements of the governing statute and acted in a

22 purposeful, deliberate, or calculated fashion.  Because Plaintiff fails to point out specific evidence

23

24

**Civil No. 13-1569 (GAG)**

that demonstrates that Defendants were acting with reckless disregard or deliberate indifference to their ADEA-related obligations, her willful violation under ADEA claim does not hold water.

Accordingly, the court hereby **GRANTS** Defendants' motion for summary judgment at Docket No. 36 as to Plaintiff's claim for willful violation under the ADEA and said claim is hereby **DISMISSED**.

F.   Supplemental Law Claims

In addition to her federal claims, Plaintiff pleads supplemental state law claims under Puerto Rico's anti-discrimination statute, Law 100, and its anti-retaliation statute, Law 115.

i.   *Age discrimination under Puerto Rico Law 100*

Law 100 prohibits employment discrimination based on a variety of factors including age. P.R. LAWS ANN. tit. 29, § 146; Baralt v. Nationwide Mut. Ins. Co., 251 F.3d 10, 15 (1st Cir. 2001). Under Law 100, a plaintiff establishes a *prima facie* case of age discrimination by: (1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory. Cardona Jimenez v. Bancomercio de Puerto Rico, 174 F.3d 36, 42 (1st Cir. 1999). If this minimal showing is made, the burden shifts to the employer to prove by a preponderance of the evidence that it had "just cause" for its actions. Id. at 42-43. If the employer establishes just cause, the burden of proof returns to the plaintiff. Cardona Jimenez, 174 F.3d at 43. If the employer fails to prove just cause, however, it bears the burden of proving by a preponderance of the evidence that the decision was not motivated by age discrimination. Id. As aforementioned in the court's discussion of Plaintiff's age discrimination claim under the ADEA, there is a genuine issue of material fact as to whether the record contains direct evidence of a discriminatory animus behind the adverse employment action discrimination because there was not

Civil No. 13-1569 (GAG)

even the sorts of stray remarks that are suggestive but often found insufficient to prove discrimination in the absence of more meaningful evidence.

Because the analysis is practically the same under both federal and Puerto Rico law, Plaintiff chose to develop her arguments under the federal standards and case law.  The court agrees that the analytical principles are substantially the same and in the interest of judicial efficiency, does not analyze the claims separately under Puerto Rico law.  The First Circuit held that "on the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous."  Davila v. Corp. de P.R. para la Difusión Pública, 498 F.3d 9, 18 (1st Cir. 2007).

Accordingly, Defendants motion for summary judgment at Docket No. 36 is **DENIED** as to the age discrimination claim under Puerto Rico law 100.

### ii.   Retaliation Claims under Puerto Rico Law 115

Plaintiff alleges that Defendants retaliated against her in violation of Law 115, P.R. LAWS ANN. tit. 29, § 194a.  (Docket No. 1 ¶ 151.)  Subsection of Puerto Rico Law 115 provides in pertinent part:

> No employer may discharge, threaten, or discriminate against an employee regarding the terms, conditions, compensation, location, benefits or privileges of the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico, when such expressions are not of a defamatory character nor constitute disclosure of privileged information established by law.

Tit 29, § 194a.

In order to prevail on a claim under Law 115, Plaintiff must show that: (1) she engaged in protected activity; and (2) she was subsequently discharged.  Lupu v. Wyndham El Conquistador Resort & Golden Door Spa, 524 F.3d 312, 313 (1st Cir. 2008).  In analyzing a prima facie Law 115 case, the adjudicating court should consider whether or not the Plaintiff established a causal link or connection between the protected activity and the adverse employment action.  Farb v.

37

Civil No. 13-1569 (GAG)

Perez-Rivera, 957 F. Supp. 2d 129, 142 (D.P.R. 2013).  A showing of a protected activity closely followed by an adverse action is indirect proof of a causal connection between the employment action and the protected activity.  Id.  Besides temporal proximity, Plaintiff can present other sources of circumstantial evidence that can substantiate a retaliation claim, including evidence of differential treatment.  Id.  As established in the court's previous discussion of Plaintiff's retaliation claim under the ADEA, Plaintiff has shown that she engaged in protected activity by filing a charge with the ADU.

Again, because the analysis is practically the same under both federal and Puerto Rico law, Plaintiff chose to develop her arguments under the federal standards and case law.  The court agrees that the analytical principles are substantially the same and in the interest of judicial efficiency, does not analyze the claims separately under Puerto Rico law.  The evidentiary mechanism provided by Law 115 mirrors the McDonnell Douglas framework which we already address.  See Rivera Rodriguez v. Sears Roebuck de P.R., Inc., 423 F.3d 379, 383 n.2 (1st Cir. 2005) (affirming the dismissal of Plaintiff's claims under Law 100 and Law 115 for the same reasons as their federal ADEA counterparts).

Accordingly, Defendants motion for summary judgment at Docket No. 36 is **DENIED** as to the retaliation claim under Puerto Rico law 115.

## IV.    Conclusion

In sum, the court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment at Docket No. 36.  The court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's age discrimination under Title VII, hostile work environment, and willful violation under the ADEA claims and hereby **DISMISSES** said claims.  However, because reasonable minds may differ in answering issues raised by both parties in regard to Plaintiff's age

**Civil No. 13-1569 (GAG)**

discrimination and retaliation claims under the ADEA, it would be improper for the court to usurp their resolution from the jury.  Accordingly, the court **DENIES** Defendants' motion for summary judgment as to said claims at Docket No. 36.  For the same reasons, the court also **DENIES** Defendants' motion for summary judgment as to Plaintiff's Law 100 and Law 115 claims at Docket No. 36.

This case is hereby referred to Magistrate Judge Marcos Lopez for the holding of a pre-trial-settlement conference. The parties should file a JOINT, proposed pre-trial memorandum. The conference and deadline for the joint filing shall be set by Magistrate Judge Lopez.  The parties shall engage in further, good-faith negotiations prior to the conference, as Judge Marcos Lopez may issue any other settlement directives. The court hopes that the instant ruling will aid the parties in reaching an acceptable compromise which will end this litigation.

**SO ORDERED.**

In San Juan, Puerto Rico this 27th day of August, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge